# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| TODD O'GARA and | § | |
| WANU WATER INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:18-CV-2603-B |
| | § | |
| JOSEPH P. BINKLEY III, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Todd O'Gara, founder, president, and chairman of Wanu Water Inc., and Wanu Water bring suit against a company investor, Defendant Joseph P. Binkley III, based on his involvement in an alleged orchestrated campaign to harass and damage Plaintiffs' reputations. The alleged campaign took the form of several emails in which Binkley and other investors/directors questioned O'Gara's academic credentials and ability to lead the company, all in an alleged attempt to undermine other directors' and stockholders' confidence in the company and induce breaches of contract. Binkley seeks dismissal of this suit under the Texas Citizens Participation Act (TCPA) and Federal Rule of Civil Procedure 12(b)(6) arguing that the Complaint violates his rights of association and free speech and that O'Gara and Wanu Water fail to state any plausible claims for relief. Having been fully briefed, the Court finds that the TCPA does not apply in federal court, and thus, declines to grant Defendant's Motion to Dismiss pursuant to the TCPA. However, as discussed below, the Court **GRANTS** Defendant's Motion to Dismiss (Doc. 8) under Rule 12(b)(6).

# I.

# BACKGROUND[1]

This dispute involves a series of allegedly defamatory emails and interactions between investors[2] of Wanu Water and the founder and president of the company, O'Gara. In 2010, O'Gara founded Wanu Water (formerly known as FLUROwater). Doc. 1, Compl., ¶ 7. The company is a Delaware corporation, based in California, and creates and sells nutrient-infused water. *Id.* ¶ 2. Binkley is a Texas investor in Wanu Water and as of July 2018, he owned a 0.13% share of the company's outstanding equity. *Id.* ¶ 3.

Discussed in more detail below, the events giving rise to this lawsuit began in August 2018, when Binkley and other investors began emailing O'Gara, his legal counsel, and other investors regarding O'Gara's purported academic credentials and management concerns they had. *Id.* ¶¶ 26–68. Based on this conduct, Plaintiffs filed suit against Binkley on September 28, 2018, invoking this Court's diversity jurisdiction. *Id.* ¶ 4. Although all the claims are brought under California law and based on the same alleged conduct, the claims are brought by O'Gara individually, Wanu Water individually, or by both Plaintiffs jointly. Specifically, O'Gara brings his own claims for tortious interference with business relations, *id.* ¶¶ 69–76; tortious interference with contract, *id.* ¶¶ 77–84; and libel, *id.* ¶¶ 85–91. Wanu Water brings its own claim for libel. *Id.* ¶¶ 100–08. And both Plaintiffs bring claims for civil conspiracy, *id.* ¶¶ 92–99; and unfair and/or unlawful business practices

---

[1]The Court draws its factual account from Plaintiffs' Complaint (Doc. 1) as well as the parties' briefing on this Motion. Any contested facts are identified as the allegation of a particular party.

[2] This lawsuit is brought only against investor Binkley; however, in the Complaint Plaintiffs refer to actions and emails made by other directors and investors in the company such as Sheldon Coleman and Greg Hunter who are named defendants in similar actions in other jurisdictions. Doc. 1, Compl., ¶¶ 25–26, n.1–2.

in violation of California's unfair competition laws, *id.* ¶¶ 109–13.

On November 5, 2018, Binkley filed this Motion to Dismiss under the Texas Citizens Participation Act (TCPA) and Federal Rule of Civil Procedure 12(b)(6) arguing that the Complaint violates his rights of association and free speech and that Plaintiffs otherwise fail to state any plausible claims for relief. *See generally* Doc. 8, Mot. to Dismiss. Plaintiffs filed their Response (Doc. 20) to Binkley's Motion, and Binkley filed his Reply (Doc. 25). Binkley's Motion is therefore ripe for the Court's review.

## II.

## DISMISSAL UNDER THE TEXAS CITIZENS PARTICIPATION ACT

Binkley first seeks dismissal of this suit arguing that Plaintiffs' Complaint is a violation of his rights of association and free speech, and thus, is subject to dismissal under the TCPA, also known as an anti-SLAPP statute. Doc. 8, Def.'s Mot. to Dismiss, 2; *see also Serafine v. Blunt*, 466 S.W.3d 352, 356 (Tex. App.—Austin 2015, no pet.) ("SLAPP is an acronym for 'Strategic Lawsuits Against Public Participation'"). Plaintiffs argue that the TCPA does not apply in federal court because it is procedural, and alternatively, even if it were substantive, it would not apply because it conflicts with federal procedural rules. Doc. 20, Pls.' Resp., 5–9.

A.     *Which Anti-SLAPP Statute Governs—Texas or California?*

Before the Court can discuss any potential anti-SLAPP statute applicability in this case, the Court must first determine which statute to consider—Texas or California—because they differ in their reach and application. *See Diamond Ranch Acad., Inc. v. Filer*, 117 F. Supp. 3d 1313, 1320 (D. Utah 2015) ("court[s] only engage in a choice of law analysis if a true conflict exists between the two

state laws.").[3] Although the parties agree, for purposes of this motion to dismiss, that California state law governs Plaintiffs' causes of action discussed below, they dispute whether Texas's or California's anti-SLAPP statute applies. Binkley argues that Texas's anti-SLAPP statute should apply since that is where he resides and allegedly made these statements. Doc. 8, Def.'s Mot. to Dismiss, 8. Plaintiffs counter that California's anti-SLAPP statute should apply because even if Binkley made the statements in Texas—which they argue is unclear since his email signature lists a Nashville, Tennessee area code—Binkley cannot overcome the Restatement's presumption in favor of applying the law of a plaintiff's domicile—here, California. Doc. 20, Pls.' Resp., 10–11 & n.6.

"District courts sitting in diversity apply the choice-of-law rules of the forum state." *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004). Texas uses the "most significant relationship" test provided by the Restatement (Second) of Conflict of Laws for all choice-of-law cases except contract cases in which the parties have agreed to a valid choice of law clause or where there is a statutory directive. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420–21 (Tex. 1984); Restatement (Second) of Conflict of Laws §§ 6, 145 (1971) [hereinafter "Restatement"].[4] And more specifically, when conducting a choice-of-law analysis regarding a tort claim, Texas courts look to § 145 of the

_____

[3] For example, under California's anti-SLAPP statute, a defendant may only file a motion to strike the complaint if the plaintiff's right to petition or right to free speech regarding a public issue is infringed upon. Cal. Civ. Proc. Code § 425.16(b)(1). Whereas in Texas, the statute provides broader protections for freedom of speech, petition, or association, and is invoked through a motion to dismiss. Tex. Civ. Prac. & Rem. Code § 27.003(a).

[4] The Restatement provides the following general considerations to guide a court's choice of law determination: "(a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied." Restatement § 6(2).

-4-

Restatement. *TV–3, Inc. v. Royal Ins. Co. of Am.*, 28 F. Supp. 2d 407, 419–20 (E.D. Tex. 1998). The factors to be considered under Restatement § 145 include: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." Restatement § 145(2). Section 145 further provides that these factors are to be considered "according to their relative importance with respect to the particular issue." *Id.*

Plaintiffs argue that because the Restatement requires the defamation laws of a plaintiff's domicile and place of injury (in this case, California) to generally apply, irrespective of where the defamatory statements were made, California's anti-SLAPP statute should be applied. Doc. 20, Pls.' Resp., 9. However, the fact that California law governs Plaintiffs' substantive claims—*e.g.*, defamation—is not dispositive on this issue since laws from different states can apply to different claims. *See Chi v. Loyola Univ. Med. Ctr.*, 787 F. Supp. 2d 797, 803 (N.D. Ill. 2011) (applying Arizona law to plaintiff's defamation claim but applying Illinois's anti-SLAPP statute); *see also Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 311 n.6 (5th Cir. 2000) (noting that Texas courts are required to undertake an "issue by issue" choice-of-law analysis). This is because the "issue of whether a statement is defamatory . . . is distinct from the issue of whether the statement is privileged" by a state's anti-SLAPP statute. *Chi*, 787 F. Supp. 2d at 803 (quoting *Global Relief Found. v. N.Y. Times Co.*, 2002 WL 31045394, at *10 (N.D. Ill. Sept. 11, 2002)).

Instead, in the anti-SLAPP context, courts typically consider the place where the allegedly

tortious conduct occurred and the speaker's domicile in determining what state's law to apply.[5] This is because the primary purpose behind an anti-SLAPP statute is to encourage and safeguard its citizens' constitutional rights. *See, e.g.,* Tex. Civ. Prac. & Rem. Code § 27.002. Although it is unclear whether or not Binkley in fact made these allegedly defamatory statements in Texas, it is undisputed that Binkley is domiciled in Texas, which weighs heavily in favor of applying Texas's anti-SLAPP statute.[6] *See Underground Sols., Inc.*, 41 F. Supp. 3d at 726 (finding that a speaker's residence is one of the "central" factors to consider in determining which state's anti-SLAPP statute to apply). Thus, the Court finds that applying California's anti-SLAPP statute to a Texas defendant would impede on Texas's interest in protecting its citizens and fulfilling the statute's purpose in a similar way that applying Texas's defamation law to a California plaintiff would infringe on California's interests. The Court therefore will analyze whether Texas's anti-SLAPP statute applies in federal court.

B.    *Does Texas's Anti-SLAPP Apply in Federal Court?*

Having found that Texas's anti-SLAPP statute is the one that potentially would apply in this case, the Court must now determine whether it in fact applies under the doctrine set out in *Erie R.*

---

[5] *See, e.g.*, *Diamond Ranch*, 117 F. Supp. 3d at 1324 (applying California's anti-SLAPP statute because that is where the defendant was from and made the statements); *Underground Sols., Inc. v. Palermo*, 41 F. Supp. 3d 720, 725–726 (N.D. Ill. 2014) (applying Tennessee's anti-SLAPP statute—even when defendant argued in favor of applying another state's statute—because that is where the defendant was domiciled and made the statements); *Chi*, 787 F. Supp. 2d at 803 (finding that Illinois's anti-SLAPP statute applied because that is where the defendant was from and made the statements); *but see Ayyadurai v. Floor64, Inc.*, 270 F. Supp. 3d 343, 354–55 (D. Mass. 2017) (applying Massachusetts's anti-SLAPP statute, where the plaintiff was domiciled, in part because defendants were unable to overcome the presumption for applying the law of plaintiff's domicile) [*appeal filed*, 17-1991 (1st Cir.)].

[6] Plaintiffs contest whether Binkley sent the allegedly defamatory emails from Texas because his email signature contains a Tennessee phone number. Doc. 20, Pls.' Resp., 11 n.6. Although Plaintiffs' Complaint does not allege the location of where the emails came from, it does allege that Binkley is domiciled in Texas. Doc. 1, Compl., ¶ 3. Absent more facts, the Court does not find the fact that Binkley may have a Tennessee phone number sufficient to affect the Court's choice-of-law analysis.

*Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Texas's anti-SLAPP statute "protects citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them." *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015) (citing Tex. Civ. Prac. & Rem. Code §§ 27.001–.011). Specifically, "[i]f a legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may file a motion to dismiss the legal action." Tex. Civ. Prac. & Rem. Code § 27.003(a). The statute's purpose is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." *Id.* § 27.002. "To effectuate this purpose, the TCPA creates a special procedure for obtaining the early dismissal of allegedly retaliatory and unmeritorious lawsuits that are based on the defendant's exercise of certain First Amendment rights." *Misko v. Backes*, 2018 WL 2335466, at *1 (N.D. Tex. May 4, 2018) (citing *In re Lipsky*, 411 S.W.3d 530, 539 (Tex. App.—Fort Worth 2013, orig. proceeding)).

Whether the TCPA applies in federal court is an "important and unresolved issue" in the Fifth Circuit—*i.e.*, whether the TCPA is substantive and does not conflict with federal procedural rules.[7] *See Block v. Tanenhaus*, 867 F.3d 585, 589 & n.2 (5th Cir. 2017). "To the extent courts in this circuit have signaled that state anti-SLAPP laws apply in federal court, courts have done so in the

---

[7] The Court notes that currently there is an appeal pending before the Fifth Circuit that may or may not resolve the issue of whether the TCPA applies in federal court under *Erie*. *See Klocke v. Watson*, No. 17-11320 (5th Cir.), appeal filed on Nov. 8, 2017, oral argument heard on September 5, 2018. However, the Fifth Circuit has yet to issue a decision in this case and neither party has requested a stay pending this decision.

context of an exercise of diversity jurisdiction, by virtue of the doctrine set out in *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)." *Misko*, 2018 WL 2335466, at *2 (citing *Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 168–69 (5th Cir. 2009) ("Louisiana law, including the nominally-procedural Article 971 [(Louisiana's anti-SLAPP provision)], governs this diversity case."); *Williams v. Cordillera Commc'ns, Inc.*, 2014 WL 2611746, at *2 (S.D. Tex. June 11, 2014) (explaining that state anti-SLAPP statutes "are enforceable in federal courts sitting in diversity jurisdiction" by virtue of the *Erie* doctrine)).

However, in *Henry v. Lake Charles American Press,* a case involving an appeal from a denial of a motion to dismiss under Louisiana's anti-SLAPP statute, the Fifth Circuit "stated without explanation that [the] 'Louisiana [anti-SLAPP] law . . . governs this diversity case.'" *Block*, 867 F.3d at 589 n.2. Based in part on the lack of an *Erie*-style analysis in *Henry*, subsequent Fifth Circuit cases—in an attempt to reconcile *Henry* with the majority of cases stating that the applicability of anti-SLAPP statutes in federal cases is an open question—have interpreted *Henry* as "assuming the applicability of [Louisiana's anti-SLAPP statute] for purposes of that case without deciding its applicability in federal courts more generally." *Id.* (citing *Lozovyy v. Kurtz*, 813 F.3d 576, 582–83 (5th Cir. 2015)); *see also Cuba v. Pylant*, 814 F.3d 701, 706 & n.6 (5th Cir. 2016) (discussing *Henry* yet still assuming without deciding that Texas's anti-SLAPP statute controls as state substantive law in diversity suits); *Culbertson v. Lykos*, 790 F.3d 608, 631 (5th Cir. 2015) ("We have not specifically held that the TCPA applies in federal court; at most we have assumed without deciding its applicability."). Therefore, because the applicability of Texas's anti-SLAPP statute "in federal court is an important and unresolved issue in this circuit," *Block*, 867 F.3d at 589, the Court embarks on determining its application to this case.

Here, Plaintiffs brought suit pursuant to the Court's diversity jurisdiction. Doc. 1, Compl., ¶ 4. Thus, "[u]nder the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). And "[i]f there is a 'direct collision' between a state substantive law and a federal procedural rule that is within Congress's rulemaking authority, federal courts apply the federal rule and do not apply the substantive state law." *Block*, 867 F.3d at 589 (citing *All Plaintiffs v. All Defendants*, 645 F.3d 329, 333 (5th Cir. 2011)). This means that the Court "should not apply a state law or rule if (1) a Federal Rule of Civil Procedure 'answer[s] the same question' as the state law or rule and (2) the Federal Rule does not violate the Rules Enabling Act." *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333 (D.C. Cir. 2015) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010)).

Although the Fifth Circuit has assumed that the TCPA applies in federal court, other circuits, as well as a dissent from the Fifth Circuit, have thoroughly and persuasively addressed this issue. For example, in *Cuba v. Pylant*, Judge Graves authored a well-reasoned dissent disputing the majority's presumption that the TCPA applies. Instead, Judge Graves went on to conduct an *Erie* analysis and concluded that:

> the TCPA is procedural and must be ignored. The TCPA is codified in the Texas Civil Practice and Remedies Code, provides for a pre-trial motion to dismiss claims subject to its coverage, establishes time limits for consideration of such motions to dismiss, grants a right to appeal a denial of the motion, and authorizes the award of attorneys' fees if a claim is dismissed. This creates no substantive rule of Texas law; rather, the TCPA is clearly a procedural mechanism for speedy dismissal of a meritless lawsuit that infringes on certain constitutional protections. Because the TCPA is procedural, I would follow *Erie*'s command and apply the federal rules.

*Id.* at 719 (internal citations omitted). Judge Graves went on to state that even if the TCPA were

deemed substantive, it would still yield to federal law because it conflicts with federal procedural rules—namely with Federal Rules of Civil Procedure 12(b)(6) and 56 because the TCPA heightens the pleadings standards and burdens of proof required to defeat an anti-SLAPP motion. *Id.* at 719–20 (noting that to survive a motion to dismiss the TCPA requires evidence of a claim to be "unambiguous, sure, or free from doubt," whereas Rule 12(b)(6) only requires facts sufficient to state a claim that are plausible on their face). Similarly in *Abbas v. Foreign Policy Group, LLC*, the D.C. Circuit held that federal courts sitting in diversity cannot apply the Washington D.C. anti-SLAPP statute's special motion-to-dismiss provision because it conflicts with Rules 12 and 56. 783 F.3d at 1333–34.

Having reviewed the issue, the Court joins other courts in agreeing with and adopting Judge Graves' dissent in *Cuba,* and thus, the Court finds that Plaintiffs' claims are not subject to dismissal under the TCPA in federal court. *See, e.g.*, *William Noble Rare Jewels, L.P. v. Sky Glob. L.L.C.*, 2019 WL 935954, at *1–2 (N.D. Tex. Feb. 25, 2019) (Godbey, J.); *Rudkin v. Roger Beasley Imports, Inc.*, 2017 WL 6622561, at *2–3 (W.D. Tex. Dec. 28, 2017), *report and rec. accepted*, 2018 WL 2122896 (W.D. Tex. Jan. 31, 2018) (Yeakel, J.). Even if the TCPA were considered substantive, as Judge Graves's dissent and the D.C. Circuit's opinion in *Abbas* found, the Court finds that the TCPA clearly conflicts with Rules 12 and 56, which already addresses the same question of when a party's claims are subject to pretrial dismissal in federal court. *See Ins. Safety Consultants LLC v. Nugent*, 2016 WL 2958929, at *5 (N.D. Tex. May 23, 2016) (Boyle, J.) (citing *Abbas* and holding that plaintiffs' state-law claims were not subject to dismissal under the TCPA). Accordingly, the Court declines to apply the TCPA in federal court, and thus, declines to grant Binkley's Motion to Dismiss on this ground.

## III.

## DISMISSAL UNDER RULE 12(b)(6)

Next, the Court turns to Defendant's grounds for dismissal under Rule 12(b)(6).

A.      *Rule 12(b)(6) Standard*

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) authorizes a court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." *Id.* 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). "The court's review [under 12(b)(6)] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim *and* referenced by the complaint." *Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019) (emphasis added) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citation omitted)).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

When well-pleaded facts fail to achieve this plausibility standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks and alterations omitted).

B.    *Libel*

First, Binkley seeks dismissal of Plaintiffs' libel claims brought under California Civil Code § 45.[8] O'Gara and Wanu Water bring separate libel claims against Binkley; however, both claims are based on nearly identical allegations—the allegedly defamatory statements made in the emails Binkley sent to directors and shareholders that questioned O'Gara's academic credentials and his management of the company. *See* Doc. 1, Compl., ¶¶ 87–89, 102–104. Thus, the Court addresses these separate claims together.

Under California Civil Code § 45 "[t]he elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." *Wong v. Jing*, 117 Cal. Rptr. 3d 747, 761 (Cal. Ct. App. 2010). Binkley argues that Plaintiffs fail to state a claim for libel because Binkley's statements (1) do not contain affirmative false statements of fact, (2) are not defamatory, and (3) even assuming they are false and defamatory, they are nevertheless privileged by the common-interest privilege. Doc. 8, Def.'s Mot. to Dismiss, 15–19.

The alleged statements and publications on which Plaintiffs base their libel claims on are two emails, an investor letter containing a series of questions addressed to O'Gara, and the alleged

---

[8] As discussed above, the parties agree for purposes of this Motion that California law applies to Plaintiffs' state law claims and that California law is not inconsistent with Texas law on these claims. Doc. 8, Def.'s Mot. to Dismiss, 15 n.71. Regardless, the Court finds that California law is the proper state law to apply under § 145 of the Restatement regarding tort claims since Plaintiffs' injuries occurred in California, Binkley's allegedly defamatory and harassing behavior was directed at a California resident and company, and both Plaintiffs are domiciled in California.

distribution of one background check report regarding O'Gara's academic credentials.[9] Discussed in greater detail below, the statements contained in these documents can be split up into two separate categories of allegedly defamatory statements—one category based on O'Gara's purported academic credentials and the other based on O'Gara's alleged mismanagement of Wanu Water. Ultimately, the Court finds that the statements regarding O'Gara's academic credentials fail to give rise to a libel claim because they are not alleged to be false. Second, those same statements and the questions regarding the mismanagement of Wanu Water are privileged and were not made with actual malice.

1.    False Statement: Statements Regarding O'Gara's Academic Credentials

First, the Court finds that O'Gara has failed to allege that Binkley's alleged defamatory statements regarding O'Gara's purported academic degrees or that the background check were false. And the Court also finds that any potential misstatements about schools O'Gara attended are not capable of sustaining a defamatory meaning.

For a statement to even be susceptible of a defamatory meaning it must first be shown to be provably false. *Bentley Reserve LP v. Papaliolios*, 160 Cal. Rptr. 3d 423, 429 (Cal. Ct. App. 2013). In other words, "[t]ruth is a complete defense to defamation." *Terry v. Davis Cmty. Church*, 33 Cal. Rptr. 3d 145, 159 (Cal. Ct. App. 2005); *see also Smith v. Maldonado*, 85 Cal. Rptr. 2d 397, 403 (Cal. Ct. App. 1999) (stating that truth is a complete defense to a defamation claim "regardless of bad faith or malicious purpose"). And although the burden of pleading and proving truth is on the defendant, the defendant need not show the truth of every word; "it is sufficient that he prove the

---

[9] Because the emails, investor letter, and background check report were either attached to the Complaint, or are central to Plaintiffs' claims, referenced by the Complaint, and were attached to Defendant's Motion to Dismiss, it is proper for the Court to consider them in ruling on this 12(b)(6) Motion. *See Ironshore Europe DAC*, 912 F.3d at 763.

substance of the charge to be true." *Swaffield v. Univ. Ecsco Corp.*, 76 Cal. Rptr. 680, 690 (Cal. Ct. App. 1969).

Generally, the existence of a defamatory meaning is a question of fact for the jury; however, "a court may properly determine whether a statement is fairly susceptible of a defamatory meaning when presented with a motion to dismiss." *Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1120 (C.D. Cal. 1998) (internal citations omitted) (quoting *Church of Scientology of Cal. v. Flynn*, 744 F.2d 694, 696 (9th Cir. 1984) and citing *Dodds v. Am. Broad. Co., Inc.*, 145 F.3d 1053, 1065 (9th Cir. 1998)). In determining whether a statement is fairly susceptible of a defamatory meaning, courts are to look at the totality of the circumstances in which the statement was made. *Id.* at 1121. Therefore, in order to determine whether the statements Binkley made in email communications or the background check report regarding O'Gara's academic credentials are false and defamatory, the Court looks at the circumstances in which they were made.

Here, Binkley's concern and reason for inquiry into O'Gara's academic credentials was based on statements made by Wanu Water in a Private Placement Memorandum that was sent to potential investors for the stated purpose of "analyzing the desirability of an investment in [Wanu Water]." Doc. 10, Def.'s App., 8. Parts of the memorandum stated that O'Gara developed the idea for Wanu Water while he was studying dentistry in Australia and was completed during his dental residency in South America. *Id.* at 19. The memorandum also included management team bios. *Id.* at 43–46. O'Gara's bio states that he holds a D.M.D from the University of Sydney; a D.D.S. from New York University; a B.S. in Biochemistry from the University of Nevada, Reno; and that in 2011 he "was awarded the Certificate of Dental Excellence by the American Dental Association for his outstanding work promoting oral health in New York." *Id.* at 43. Investors, like Binkley, who chose

to invest in Wanu Water also entered into Securities Subscription Agreements. Doc. 8, Def.'s Mot. to Dismiss, 3. And in those Agreements, Wanu Water stated that the Private Placement Memorandum provided to the investor did not contain or omit any misstatement of material fact concerning the company. *Id.*

It is in this context that Binkley first sent an email on August 3, 2018, to O'Gara and other Wanu Water board members and stockholders requesting that O'Gara agree to a third-party background check to determine whether the academic and professional credentials O'Gara touted in the past were valid.[10] Doc. 1-1, Compl., Ex. A, 3–4 ("I apologize for the abruptness of this e-mail, but it has come to my attention that your academic and professional credentials may not be valid."). After no response from O'Gara, Binkley sent a second email on August 9, 2018, to O'Gara, O'Gara's legal counsel, and other Wanu Water board members and stockholders. Doc. 10, Def.'s App., 83. This email was similar to the first and stated that based on their (Binkley and other investors) own research they continued to have reasons to doubt the credibility of O'Gara's credentials that he touted to potential Wanu Water investors and that "[i]f this [was] a misunderstanding on [their] part, [O'Gara could] prove that very easily by agreeing to a third party background check." *Id.*; Doc. 1, Compl., ¶ 39. Attached to this email was a document outlining resume discrepancies in O'Gara's academic credentials, which O'Gara argues was incomplete and inaccurate. Doc. 1, Compl., ¶ 41.

---

[10] Plaintiffs argue that Binkley's and other investors' concerns regarding O'Gara's academic credentials are unwarranted and would not amount to any type of securities-law violations because the investors never raised these concerns about O'Gara's credentials when they invested in the company and Wanu Water's legal counsel at the time that the investors allegedly distributed the background check said that "inadvertent misstatements about O'Gara's education would likely be considered immaterial." Doc. 1, Compl., ¶¶ 27–28, 45. However, the Court notes that its holding is in no way affected by whether or not any purported misstatement would be material and amount to securities-law violations. That is not the Court's inquiry. Instead, the Court notes these concerns to put Binkley's statements and the background check in context of the environment under which they were made.

And lastly, because O'Gara refused to submit to a third-party background check, Binkley and other board members and investors allegedly retained Corporate Resolutions to perform a background check on O'Gara based on information Binkley and others provided. *Id.* ¶ 43. Then, on August 21, 2018, based in part on this information and its own investigation, Corporate Resolutions issued its report on O'Gara, which O'Gara argues "was incomplete, inaccurate, and the result of a less than thorough effort." *Id.* ¶ 44. The report noted all of O'Gara's degrees he touted as "unconfirmed" and summarized the investigatory steps Corporate Resolutions undertook in reaching those conclusions. Doc. 10, Def.'s App., 94. O'Gara alleges that the report was circulated; however, no where in the Complaint does O'Gara allege that Binkley in particular circulated the report or sent the report to any specific person. Doc. 1, Compl., ¶¶ 44–45, 87, 102.

With this background in mind, the Court now turns to whether Plaintiffs' allegations regarding these emails and background-check report state a libel claim. The only allegation of a false statement regarding O'Gara's academic credentials in Plaintiffs' complaint states: "Binkley's suggestion that O'Gara did not attend schools that he did in fact attend were false and misleading." Doc. 1, Compl., ¶ 89. However, in his Complaint and briefing on this Motion, O'Gara fails to allege what institutions he attended or received degrees from. Regardless, interpreted in context, the Court finds that Binkley's questions regarding O'Gara's academic credentials or the background check were not focused on what academic institutions O'Gara did or did not attend, but whether the *degrees* he touted in the Private Placement Memorandum were in fact accurate. Furthermore, any potential false statements that O'Gara did not attend a certain school that he may have attended, but not received a degree from, are not reasonably capable of maintaining a defamatory meaning. *See Masson*, 501 U.S. at 517 (holding that "[m]inor inaccuracies do not amount to falsity so long as 'the

substance, the gist, the sting, of the libelous charge be justified'"). Here, the gist of Binkley's allegedly libelous statements was whether O'Gara in fact had the purported degrees and accolades O'Gara touted in the memorandum. Plaintiffs' Complaint fails to allege that these statements were false and that O'Gara in fact received these degrees. And Binkley has provided the necessary context, including the resume discrepancies and background-check report, to call into question the validity of O'Gara's degrees. *See* Doc. 10, Def.'s App., 84–105. Therefore, because these statements are not fairly susceptible to a false meaning, Plaintiffs' libel claims fail.[11]

    2.    <u>Common-Interest Privilege: Statements Regarding O'Gara's Academic Credentials & Mismanagement of Wanu Water</u>

Second, the Court does not find that the statements regarding O'Gara's academic credentials and management of Wanu Water are capable of sustaining a defamation claim because they were privileged communications, made without malice, between interested investors and O'Gara, the president of the company.

Under California Civil Code § 47(c), also known as the common-interest privilege, a privileged publication is one made

> [i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information.

Cal. Civ. Code § 47(c). It is proper for a court to determine at the motion-to-dismiss stage whether the common-interest privilege applies because a requisite element of a libel claim under California

---

[11] In addition to not being alleged to be false, as discussed below, these statements regarding O'Gara's academic credentials are subject to the common-interest privilege, and thus, Plaintiffs fail to state a libel claim on this ground as well. *See infra* Section III.B.2.

law is that the allegedly defamatory statement be unprivileged. *See Wong*, 117 Cal. Rptr. 3d at 761; *see also Hawran v. Hixson*, 147 Cal. Rptr. 3d 88, 114 (Cal. Ct. App. 2012) (holding that the application of the common-interest privilege is ordinarily a question of law for the court). Courts applying the common-interest privilege utilize a burden-shifting framework where the "defendant generally bears the initial burden of establishing that the statement in question was made on a privileged occasion, and thereafter the burden shifts to plaintiff to establish that the statement was made with malice." *Taus v. Loftus*, 151 P.3d 1185, 1210 (Cal. 2007).

In addition to the statements regarding O'Gara's academic credentials, the specific investor questions that O'Gara takes issue with are: "Has the expense account abuse been curtailed?"; "Have certain executive salaries been brought in line with what is appropriate for a company of this size and stage?"; "Is the board keeping minutes and conducting board business per generally accepted standards?"; "What accounts have been lost and why?"; "Is there an overall strategic plan? Any business plan of any type?"; and "Are ALL decisions being made in the best interests of ALL shareholders at ALL times?" Doc. 1, Compl., ¶¶ 32–33; *see also* Doc. 10, Def.'s App., 82. These questions were contained in an investor letter attached to the initial August 3, 2018 email in which Binkley emailed O'Gara and other board members and investors asking O'Gara to confirm his academic credentials. Doc. 1, Compl., ¶ 31. Plaintiffs argue that these statements are defamatory because they suggest that Wanu Water was being mismanaged and performing poorly, despite the fact that a recently completed third-party report[12] on the company and the company's financial

---

[12] In May 2018, Wanu Water engaged Solomon Law, APC to conduct an investigation into the accusations of a recently removed CEO of the company. Doc. 1, Compl., ¶¶ 17, 21. O'Gara alleges that the former CEO accused O'Gara of impairing his ability to perform as Wanu's CEO by restricting his access to records, excluding him from contract negotiations, and undermining his authority to lead. *Id.* ¶¶ 18–20. The

performance at the time showed that the opposite was true. *Id.* ¶ 33.

It is clear that the statements regarding O'Gara's academic credentials and the mismanagement of Wanu Water fall within the scope of the common-interest privilege provided by § 47(c)(2). The California Supreme Court has recognized this privilege as one that applies to a "narrow range of private interests[:] The interest protected [is] private or pecuniary; the relationship between the parties [is] close, e.g., a family, business, or organizational interest; and the request for information must have been in the course of the relationship." *Brown v. Kelly Broad.*, 771 P.2d 406, 414 (Cal. 1989); *see also* Restatement (Second) of Torts § 596 cmt. (d) (Am. Law Inst. 1977) (stating that "fellow officers of a corporation for profit, fellow shareholders and fellow servants are similarly conditionally privileged" under the common-interest privilege). Here, the statements were made in private emails and in an investor letter sent by Binkley and other investors addressed to O'Gara—the founder and president of the company they were invested in and who was significantly involved in the day-to-day operations of Wanu Water. All of the statements and questions—even those Plaintiffs do not specifically object to—were regarding either O'Gara's academic credentials he touted in company documents or the management and operation of Wanu Water. All of these matters are ones investors and board members are interested in since they can ultimately affect their pecuniary interests in Wanu Water.

Although Plaintiffs do not dispute that the common-interest privilege applies in this case, in other parts of their Response, Plaintiffs do argue that these communications were intended to have

---

former CEO also alleged that O'Gara's business expenses were excessive. *Id.* ¶ 20. O'Gara alleges that in July 2018, Solomon Law issued its report "fully discredit[ing] the former-CEO's accusations." *Id.* ¶¶ 23–24. Although the report was allegedly not to be shared with anyone outside of management or the board of directors, O'Gara alleges that one of the then-directors shared the report with Binkley. *Id.* ¶ 25.

a disparaging effect on O'Gara and Wanu Water in part because "[t]hese communications were sent or copied to most of Wanu's stockholders, many of whom did not follow the company on a daily basis and were unaware of facts concerning O'Gara." Doc. 20, Pls.' Resp., 17. However, even though Binkley did copy other board members and shareholders on the email, all of these people were either investors or then-board members in the company and many of them signed the investor letter sharing the same concerns. *See* Doc. 10, Def.'s App., 82 (investor letter signed by six individuals who were either investors or board members and who were included in the email); *see also* Doc. 1-1, Ex. A, 1. The fact that other shareholders who did not sign the investor letter were also included in the email does not defeat the privilege since all the recipients were interested in Wanu Water. And Plaintiffs do not allege that these statements or questions were shared with anyone who was not involved with Wanu Water as an investor or board member. *See Deaile v. Gen. Tel. Co. of Cal.*, 115 Cal. Rptr. 582, 585 (Cal. Ct. App. 1974) (holding that excessive publication can defeat the privilege). Therefore, the Court finds that the common-interest privilege applies to the statements forming the basis of Plaintiffs' libel claims. Thus, the questions then becomes whether Plaintiffs have shown that these statements were made with actual malice.

"The malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable ground for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." *Taus*, 151 P.3d at 1210 (emphasis in original) (citations omitted). Plaintiffs argue the latter—that the statements were reckless and made without regard for their truth. Doc. 20, Pls.' Resp., 19–21. Ultimately, the Court does not find that Plaintiffs have shown that the questions regarding O'Gara's academic credentials or management

of Wanu Water were made with the requisite malice necessary to defeat the privilege.

Although the Court recognizes that questions into the operation of Wanu Water or O'Gara's academic credentials—by the mere fact that they were posed—may have suggested that Binkley and other investors believed Wanu Water was having operational issues or that the academic degrees were inaccurate, they have not been shown to be made with malice. For example, the investor letter O'Gara takes issue with begins with an introductory paragraph showing the legitimate motivation behind these questions:

> We are at the end of yet another reporting period with ZERO information, and ZERO transparency. We understand members of the Board are working very hard, and we appreciate that. However, we must express our concerns and ask questions. Please take them in a constructive light, we just want what is best for the company and the shareholders.

Doc. 10, Def.'s App., 82 (emphasis in original). Despite this introductory language, Plaintiffs ask this Court to infer actual malice on behalf of Binkley and other investors because the recently issued third-party report had completely discredited allegations regarding O'Gara's mismanagement and because the company's "recent financial success also belies Binkley's allegations of mismanagement." Doc. 20, Pls.' Resp., 20. However, that report was allegedly not circulated to all investors in the company. *See* Doc. 1, Compl., ¶ 25 (alleging that "[n]o one at the Company, including any director, was authorized to share this Confidential Report to anyone outside of management or the Board") And more importantly, even assuming it was widely circulated, based on the introductory language of the investor letter, the investors appear to not have been given information for the reporting period that proceeded the August 3, 2018 email; therefore, they still had reason to ask the questions contained in the investor letter. *See* Doc. 10, Def.'s App., 82. Also, even assuming that Wanu Water was highly successful at the time, the Court is unwilling to find that an investor's common-interest

privilege to inquire into the management of a company exists only if a company is performing poorly.

Next, to show actual malice regarding misstatements on O'Gara's academic credentials, O'Gara argues that the resume discrepancies Binkley circulated as well as the background check on O'Gara's academic credentials were "incomplete, inaccurate, and the result of a less than thorough effort—in some instances reaching its conclusions based on a single phone call to various undergraduate and dental institutions O'Gara attended, and with no follow-up requests for transcripts, diplomas, or other evidence." Doc. 20, Pls.' Resp., 20–21. Thus, O'Gara argues that these misrepresentations were reckless and made without regard for their truth. *Id.* However, to sustain a showing of actual malice requires more than mere negligence in inquiry or investigation. *Noel v. River Hills Wilsons, Inc.*, 7 Cal. Rptr. 3d 216, 222 (Cal. Ct. App. 2003). Instead, actual malice is shown only when the "negligence amounts to a reckless or wanton disregard for the truth, so as to reasonably imply a willful disregard for or avoidance of accuracy." *Id.* (citations omitted). In this case, Binkley had independent grounds based on his own investigation and the background-check report issued by Corporate Resolutions to believe that he could at least question O'Gara regarding whether his purported academic credentials were valid. Therefore, even assuming that Binkley and Corporate Resolutions were negligent in how they conducted their investigations, that is not enough to show actual malice.

Lastly, the Court notes that its holding is also guided by public policy concerns surrounding the interactions and inquiries that often must occur between investors and company management. Defamation law should not prevent shareholders from engaging in the type of reasonable and professional inquiry that Binkley undertook in this case—especially, as is the case here where the inquiry was made between other interested individuals. Although O'Gara and Wanu Water may

have found the inquiry embarrassing, unpleasant, or otherwise unwelcome, the good that may be accomplished by allowing these types of inquiries—*e.g.,* increased oversight and corporate accountability—outweighs the potential harm that may result. Thus, the common-interest privilege should protect these types of inquiries.

Therefore, in light of the standard required to show actual malice, and while drawing all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs have failed to show that actual malice motivated Binkley and other investors in questioning O'Gara on his academic credentials and management of Wanu Water. Thus, these statements are subject to the common-interest privilege and Plaintiffs fail to state a libel claim under California law.

C.    *Tortious Interference With Business Relations*

Next, Binkley seeks dismissal of O'Gara's claim for tortious interference with business relations. O'Gara brings this claim asserting that by sending the above-discussed emails, Binkley and others "engaged in unlawful and unethical conduct in mounting a campaign to deliberately interfere with O'Gara's business relations." Doc. 1, Compl., ¶¶ 72–73. Specifically, O'Gara alleges that Binkley interfered with existing voting agreements that O'Gara had with stockholders, as well as making those same stockholders question their existing investments in the company and their decisions to make investments in the future. *Id.* ¶¶ 67, 73.

The elements of a claim for tortious interference with business relations, under California law, are "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts

of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003).

Binkley argues that O'Gara's claim fails on each element because it only contains a conclusory recitation of the tortious-interference elements, Doc. 8, Def.'s Mot. to Dismiss, 19; however, the Court focuses its analysis on the third element. In interpreting the third element, the California Supreme Court has held "that to meet this element, a plaintiff must plead and prove that the defendant's acts are wrongful apart from the interference itself." *Korea Supply Co.*, 63 P.3d at 950 (citing *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 902 P.2d 740, 751 (Cal. 1995)). "An act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable standard." *Qwest Commc'ns Corp. v. Herakles, LLC*, 2008 WL 783347, at *10 (N.D. Cal. Mar. 20, 2008) (cleaned up). Therefore, Binkley argues that O'Gara's tortious interference with business relations claim fails because his Complaint fails to state a libel claim, and thus, there is no underlying legal wrong. Doc. 8, Def.'s Mot. to Dismiss, 20. Ultimately, the Court agrees with Binkley.

The "intentional acts" that O'Gara relies on to support his claim for tortious interference with business relations are wholly based on the emails previously discussed. *See* Doc. 1, Compl., ¶ 73. However, as discussed above, the Court finds that Plaintiffs' libel claims based on those emails fail in part because of the common-interest privilege. *See* discussion *supra* section III.B.2. Therefore, because O'Gara's claim for tortious interference with business relations is derivative of his libel claim, it follows that these claim should fail as well. *See Lee v. Fick*, 37 Cal. Rptr. 3d 375, 377, 381 (Cal. Ct. App. 2005) (dismissing plaintiff's claims of conspiracy to interfere and intentional interference with prospective economic advantage because they were derivative of plaintiff's deficient libel claims); *see also Vackar v. Package Mach. Co.*, 841 F. Supp. 310, 315 (N.D. Cal. 1993) ("California courts have

held that plaintiffs may not avoid the strictures of defamation law by artfully pleading their defamation claims to sound in other areas of tort law."). O'Gara counters that his claims for civil conspiracy and unlawful and/or unfair business practices in violation of the California Business and Professions Code also form the basis of the underlying wrong sufficient to state a claim for intentional interference with business relations. Doc. 20, Pls.' Resp., 22. However, as discussed in more detail below, those claims also fail because they too are derivative of other claims, and thus, O'Gara has failed to allege any wrongful acts apart from the alleged interference itself. Therefore, O'Gara fails to state a tortious interference with business relations claim under California law.[13]

D.     *Tortious Interference With Contract*

Binkley also moves to dismiss O'Gara's claim for tortious interference with contract arguing that O'Gara's Complaint fails to indicate how Binkley's emails were intentionally designed to induce any breaches of contract nor does the Complaint allege facts showing that any contracts were breached or disrupted.[14] Doc. 8, Def.'s Mot. to Dismiss, 21–22. The contracts that O'Gara alleges were interfered with are voting agreements that O'Gara executed with roughly forty-five Wanu Water shareholders whereby the shareholders gave O'Gara the right to vote their shares. Doc. 1,

---

[13] The Court also notes that if O'Gara chooses to replead this claim, his Complaint should focus on disruptions to future economic and business relations and not existing voting agreements or contracts as his current Complaint does. *See* Doc. 1, Compl., ¶ 73. The claim of tortious interference with business relations is distinct from a claim of tortious interference with contract and requires different showings by the pleader and considerations by the Court. *See Della Penna*, 902 P.2d at 750–51 (discussing the differences between the two torts and holding as an example that with tortious interference with business relations courts should be more concerned with "maximiz[ing] areas of competition free of legal penalties").

[14] Binkley also argues that this claim fails because it is derivative of O'Gara's libel claim. However, this argument is without merit because unlike with a claim for tortious interference with business relations, California law does not require "[w]rongfullness independent of the inducement to breach the contract" for claims of tortious interference with contract. *Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513, 530 (Cal. 1998).

Compl., ¶¶ 14, 81. The execution of these voting agreements, in addition to O'Gara's personal shares, gave him roughly fifty-five percent of the voting power in Wanu Water. *Id.* ¶ 16.

Under California law, a claim for tortious interference with contract requires: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1202 (N.D. Cal. 2014) (citations omitted). Ultimately, the Court finds that this claim fails because even if the Court were to assume that coconspirator liability applied to Binkley based on another investor's email, the Complaint fails to adequately allege that any voting agreements were breached or otherwise disrupted resulting in damage to O'Gara.

The Court first notes that O'Gara has failed to alleged that Binkley himself engaged in any intentional act designed to induce a breach of the voting agreements.[15] Instead, O'Gara's main argument is that Binkley's liability is based on a September 5, 2018 email sent by another investor, Greg Hunter, to "most or all stockholders" of Wanu Water. Doc. 1, Compl., ¶ 59; Doc. 20, Pls.' Resp., 23–24. In that email, Hunter summarizes the allegations of mismanagement against O'Gara discussed above, and warns the recipients of the email both that signing the voting agreements forfeits their voting rights in the company and that they should have their attorneys review those

---

[15] O'Gara does attempt to allege that the same emails discussed in detail above, which Binkley sent, interfered with the voting agreements between O'Gara and Wanu Water stockholders. *See* Doc. 1, Compl., ¶ 81. However, as already discussed, these emails were focused on resolving discrepancies in O'Gara's academic credentials and the management of Wanu Water. Binkley's emails did not mention any voting agreements or otherwise appear that they were designed to induce a breach or disrupt those agreements.

agreements. Doc. 1-4, Compl., Ex. D, 3–4. Binkley is not alleged to have been copied on that email;

however, O'Gara alleges "[o]n information and belief" that "Hunter sent this email with the assent

and approval of Binkley." Doc. 1, Compl., ¶ 59. Although the Court finds the lack of particularized

allegations substantiating the alleged conspiracy or agreement between Binkley, Hunter, and other

investors troubling, at this stage the Court will assume without deciding that the existence of a

conspiracy may be inferred from the general allegations in the Complaint. *See Cisco Sys., Inc. v.*

*STMicroelectronics, Inc.*, 77 F. Supp. 3d 887, 894 (N.D. Cal. 2014) (stating that a conspiracy "may

be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged

conspirators, and other circumstances."); *see also Qwest Commc'ns Corp.*, 2008 WL 783347, at *13

("General allegations of agreement have been held sufficient, and the conspiracy averment has even

been held unnecessary, providing the unlawful acts or civil wrongs are otherwise sufficiently

alleged.").

However, even though the Court assumes that a conspiracy existed, and thus, liability can

potentially be imputed on to Binkley based on Hunter's email, the Complaint still fails to allege that

any voting agreements were breached or otherwise disrupted resulting in damage to O'Gara. When

showing "resulting damage":

> It has been repeatedly held that a plaintiff, seeking to hold one liable for unjustifiably
> inducing another to breach a contract, must allege that the contract would otherwise
> have been performed, and that it was breached and abandoned by reason of the
> defendant's wrongful act and that such was the moving cause thereof.

*VasoNova Inc. v. Grunwald*, 2012 WL 4119970, at *4 (N.D. Cal. Sep. 18, 2012) (quoting *Dryden*

*v. TriValley Growers*, 135 Cal. Rptr. 720, 725 (Cal. Ct. App. 1977)).

Other than in a conclusory manner, O'Gara's Complaint fails to allege that any of the roughly

forty-five voting agreements were breached or that his voting power was in anyway depleted due to Binkley or Hunter's emails. Instead, O'Gara's Complaint alleges "[o]n information and belief" that his contractual relationships with Wanu Water stockholders has and continues to be disrupted and interfered with. Doc. 1, Compl., ¶ 82. This is insufficient to state a claim for tortious interference with contract. *See LFG Nat'l Cap., LLC v. Gary, Williams, Finney, Lewis, Watson, & Sperando P.L.*, 874 F. Supp. 2d 108, 121–22 (N.D.N.Y. 2012) (applying California law and finding that "[m]ere speculation that the alleged conduct breached or disrupted the [counter-plaintiff's] contractual relationships and that damages may result are insufficient to survive a motion to dismiss" on a tortious interference with contract claim); *see also Image Online Design, Inc. v. Internet Corp. for Assigned Names & Numbers*, 2013 WL 489899, at *9 (C.D. Cal. Feb. 7, 2013) (finding that in order to state a claim "for [tortious interference with contract], [a plaintiff] must allege actual interference with actual contracts, such that the result is a specific breach, not merely general damage to the business"). Unlike information as to the existence of a conspiracy agreement, information as to whether or not any voting agreements were in fact breached resulting in damages to O'Gara is completely within his possession. O'Gara's Complaint and briefing on this Motion fail to identify any specific breach or disruption, therefore, his claim fails.

E.      *Unlawful & Unfair Business Practices*

Plaintiffs also bring claims for "unlawful" and/or "unfair" business practices in violation of the unfair competition laws provided by California Business and Professions Code §§ 17200, *et seq.* Doc. 1, Compl., ¶¶ 109–13. Binkley moves for dismissal arguing that these claims are derivative of Plaintiffs' other claims and that none of the emails Binkley sent rise to the level of being unfair or unlawful. Doc. 8, Def.'s Mot. to Dismiss, 24–25.

The statute "is written in the disjunctive, establishing three varieties of unfair competition[:]" unlawful, unfair, or fraudulent business practices. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1043 (9th Cir. 2010). "To plead a claim based on unlawful activity, a party must identify some other law and 'state with reasonable particularity the facts supporting the statutory elements' of the alleged violation." *LFG Nat'l Capital, LLC*, 874 F. Supp. 2d at 123 (quoting *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1150 (N.D. Cal. 2010)). As discussed above, the Court finds that Plaintiffs have failed to state a claim for libel or tortious interference with business relations or contract, and thus, Plaintiffs have failed to state a claim for unlawful business practices under California law. *See Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1134 (9th Cir. 2015) (holding that because the plaintiff failed to state an antitrust violation, trademark claim, or other unlawful act, it also failed to state an unfair business practices claim under California law). Moreover, based on the same reasoning discussed above regarding Binkley's common-interest privilege, the Court does not find that any of Binkley's emails or other actions he allegedly undertook rise to the level of unfair business practices. These emails and interactions were made by an interested investor to other interested individuals regarding a company they were all invested in. Therefore, Plaintiffs' claims for unlawful and/or unfair business practices also fail.

F.     *Civil Conspiracy*

And lastly, the Court discusses Plaintiffs' claim for civil conspiracy. Doc. 1, Compl., ¶¶ 92–99. "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994). "Standing alone, a conspiracy does no harm and engenders no tort liability. It must be

activated by the commission of an actual tort." *Id.* Therefore, because the Court finds that Plaintiffs' Complaint fails to state a claim for violation of any tort or other unlawful act, Plaintiffs' claim for civil conspiracy fails as well.

## IV.

## CONCLUSION

For these reasons, the Court declines to grant Defendant's Motion to Dismiss pursuant to the TCPA and holds that it does not apply in federal court. However, the Court **GRANTS** Defendant's Motion to Dismiss under Rule 12(b)(6).

Because Plaintiffs have not yet amended their Complaint, the Court **DISMISSES without prejudice** Plaintiffs' claims and grants Plaintiffs the opportunity to attempt to amend their complaint if they can do so in a manner consistent with this Order. Therefore, Plaintiffs have **thirty days** from the date of this Order to seek leave to file an amended complaint. A proposed amended complaint must be attached to the motion for leave, and Plaintiffs must summarize in their motion for leave how the proposed amended complaint cures the defects the Court noted above. If the amended complaint does not cure the noted defects or Plaintiffs fail to file an amended complaint within the time allotted, the Court will dismiss the case with prejudice and enter a final judgment.

**SO ORDERED.**

**SIGNED: April 24, 2019.**

_____

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE